ROBERT R. GROOMS ET AL. *v.* LAVALE ZONING
BOARD ET AL.

[No. 722, September Term, 1974.]

*Decided June 27, 1975.*

267

The cause was argued before MOYLAN, MENCHINE and DAVIDSON, JJ.

*John F. Somerville, Jr.,* for appellants.

*Harry I. Stegmaier,* with whom were *Stegmaier, McMullen & Kazary* on the brief, for appellee John A. Cupler, 2d et ux., and The National Jet Company.

*Leslie J. Clark* for appellee LaVale Zoning Board.

*William Walsh,* with whom were *Walsh, Walsh &*

*Reinhart* and *Lee C. Barnett* and *Barnett & Barnett* on the brief, for appellee Cumberland Mall Associates.

DAVIDSON, J., delivered the opinion of the Court.

On 26 November 1973 the appellee, LaVale Zoning Board (Board), enacted a resolution and order which amended the zoning map of the LaVale Zoning District, originally enacted in 1958.[1] The adoption of the resolution was preceded by a "study" of the entire LaVale Zoning District comprised of some 13,700 acres of land, public notice initially given on 22 June 1973 and two public hearings held on 9 July and 20 October 1973.[2] Approximately 1,328 acres of land at ten different locations, designated as Sections A through J, were rezoned by the resolution. About 925 acres were reclassified from the Rural-Residential zone (agricultural uses, small shops, dwellings) to the Residential A zone (family dwellings, apartments, churches, home occupations), while 414 acres were transferred from the Rural-Residential classification to Commercial A (retail businesses, dwellings). The reclassification approximately doubled the amount of Commercial A land available in the LaVale Zoning District.

Included in the commercial reclassification were approximately 84 acres of land, designated as Section J, owned by the appellee, Cumberland Mall Associates (owner), which were reclassified from the Rural-Residential to the Commercial A zone and which constitute the focal point of this proceeding. Proposed for construction on this site was a regional shopping center, comprised of an enclosed mall of approximately 500,000 square feet, to accommodate over 50 stores. Some property owners living in single-family residences located on lots within Section J, itself, as well as

---

1. The LaVale Zoning District was created in 1957. Zoning within that district is governed by Code of Public Laws of Allegany County (Everstine, 1963, 1973 Supp.) §§ 356-361 (Allegany County Code). The zoning regulations for the LaVale Zoning District appear in Ordinance No. 1 of the LaVale Zoning Board, dated 1 June 1972.

2. The substance of the "study" made by the Board does not appear in the record. According to the testimony at the public hearings the Board met on many occasions over an eight to ten month period before determining the precise nature of the reclassifications to be proposed and submitted for consideration at the public hearings.

other neighboring property owners (protestants) opposed, among other things, the adoption of that portion of the resolution affecting Section J. They appealed the grant of the reclassification to the Circuit Court for Allegany County where Judge James S. Getty entered an order affirming the action of the Board insofar as it affected Section J. This appeal followed. Here three questions are raised:

1) Do the protestants have standing to appeal?
2) Was the action of the Board invalid because two of its members had not been elected as required by law?
3) Did the map amendment adopted by the resolution of 26 November 1973 constitute comprehensive rezoning which bore a substantial relationship to the public health, comfort, order, safety, convenience, morals and the general welfare?

I

The Board's contention that the protestants lack standing to bring this appeal because they failed to allege and prove that they were aggrieved parties is without merit. Section 360 of the Allegany County Code provides, in pertinent part:

"Any person, persons, taxpayer or officer of the District, jointly or severally aggrieved by a decision of the LaVale Zoning Board may, within thirty days after the filing of such decision in the office of the Zoning Board, appeal to the Circuit Court for Allegany County."

Thus, under the applicable local statute, a condition precedent to be met before a person has standing to appeal the Board's decision to the Circuit Court for Allegany County is that he must be aggrieved by the decision.

The principles evolved to determine when a person is "aggrieved" by the decision of a zoning body were articulated in *Bryniarski v. Montgomery County Board of*

*Appeals*, 247 Md. 137, 143-46, 230 A. 2d 289, 294-95 (1967). Among them are the following:

"2. In cases involving appeals under the provisions of a zoning ordinance:

(a) It is sufficient if the facts. constituting aggrievement appear in the petition for appeal either by express allegation or by necessary implication. *Town of Somerset v. Montgomery County Board of Appeals*, 245 Md. 52, 225 A. 2d 294 (1966).

(b) An adjoining, confronting or nearby property owner is deemed, prima facie, to be specially damaged and, therefore, a person aggrieved. The person challenging the fact of aggrievement has the burden of denying such damage in his answer to the petition for appeal and of coming forward with evidence to establish that the petitioner is not, in fact, aggrieved. . . .

. . .

"4. If any appellant is a person aggrieved, the court will entertain the appeal even if other appellants are not persons aggrieved. *See e.g., Marcus v. Montgomery County Council, supra* [235 Md. 535, 201 A. 2d 777 (1964)]."

Applying these principles to the instant case produces a clear result. The petition was filed by seven named individuals, constituting the Committee of Concerned Citizens Opposing Rezoning. It alleges that it is brought by the petitioners on "their own behalf" as "residents of the LaVale area" as well as on behalf of "all the other citizens of the LaVale zoning area." One of the named individual appellants is Ronald C. Gordon, who testified at one of the public hearings before the Board. Exhibit 12A, a petition in opposition to the reclassification of Section J, which was introduced into evidence at the second public hearing, indicates that Gordon is a property owner residing in a

single-family residence located within the original boundaries of Section J and in close proximity to the land finally reclassified.[3] Although there was conflicting evidence in the record on the question of special damages, the trial court implicitly determined that the protestant was aggrieved. We agree. Under the present circumstances the facts constituting his aggrievement appear in the petition for appeal by necessary implication and the appeal must be entertained.

II

The protestants' contention that the action of the Board was invalid because two of its three members were not elected is also without merit. Section 359 of the Allegany County Code provides that the LaVale Zoning Board shall be comprised of three persons, each of whom is to be elected to serve a six year term. The first election was to be held in 1957 and the terms of office were arranged so that one expired in 1958, one in 1960 and one in 1962. Thereafter, every two years, one member of the Board was to be elected to serve a term of six years.

Section 359 provides, in pertinent part:

"(c) In the event of the removal from office of any member, or his failure to qualify, or his death in office, or for his inability to serve for any reason whatsoever, this subtitle *shall not fail for want of a member of the Board,* but in all such cases the Board of County Commissioners for Allegany County shall appoint a person to serve as a member of the Board to fill *the unexpired term* of the member of the Board. In the event that the original Board cannot or is not for any reason whatsoever elected at the June 18, 1957, referendum and

---

**3.** The proposed map amendment submitted for consideration at the public hearings included a tract of land within Section J upon which at least 11 single-family residences were located. Ultimately that tract of land was excluded from the reclassification of the remainder of Section J to the commercial zone.

election, the Board of County Commissioners of
Allegany County shall appoint the entire Board as
aforesaid. . . .

. . .

"(d) Oath of office. Before assuming the duties of
office, each member-elect shall take the
constitutional oath of office, which shall be
recorded in the office of the Clerk of the Circuit
Court for Allegany County." (Emphasis added.)

The record shows that one of the three members of the
Board, a Mr. Heacox, was duly elected to a six year term in
1972. His status is not in question. Another of the Board
members, Mr. Kenneth M. Wilson, was appointed to the
Board in December, 1966, to fill the unexpired term of one
John J. Rowan who resigned. There was no evidence to show
that Wilson failed to take the requisite oath. In 1968 no one
filed for the office of member of the Board, and in March,
1969, the County Commissioners appointed Wilson for a full
six year term. He thereafter took the requisite oath of office.
The third member of the Board, Mr. Robert C. Moore, was
appointed in September, 1969, to fill the unexpired term of
Arthur W. German, who resigned. He thereafter qualified
for office by taking the requisite oath. In 1970 nobody filed
for office of member of the Board and, on 12 January 1971,
Moore was appointed by the County Commissioners to a full
six year term on the Board. He thereafter took the requisite
oath. Both Wilson and Moore openly and notoriously
discharged the duties of Board members from the time they
took office until the time of the enactment of the map
amendment here in issue.

A *de jure* officer is one regularly and properly elected or
appointed and qualified, and holding his office during a
constituted term. 3 *McQuillin, Municipal Corporations* §
12.102 (3rd ed. 1973). A "de facto" officer has been defined as
one in actual possession of an office under some colorable or
apparent authority, who exercises the duties of the office
under such circumstances of reputation and acquiescence by
the public authorities and the public as is calculated to

induce people, without inquiry, to submit to or invoke his official action, supposing him to be the officer he assumed to be. *Kone v. Baltimore County*, 231 Md. 466, 471, 190 A. 2d 800, 802 (1963); *Reed v. President of Town of Northeast*, 226 Md. 229, 243-44, 172 A. 2d 536, 542 (1961); *Buckler v. Bowen*, 198 Md. 357, 369-371, 84 A. 2d 99, 105-06 (1951). A "usurper" or "intruder" has been defined as one who has neither lawful title nor color of right to office. *Reed, supra*, at 226 Md. 244, 172 A. 2d 542-43. Thus, a *de facto* officer is distinguished from a usurper or intruder by the fact that the former holds by some color of right or title while the latter intrudes upon the office and assumes to exercise its function without either the legal title or color of right to such office. 3 *McQuillin, supra*, at §§ 12.102, 12.103. Color of right may consist of an election or appointment, holding over after the expiration of a term, or by acquiescence by the public for such a length of time as to raise the presumption of colorable right by election, appointment or other legal authority to hold such office. 3 *McQuillin, supra*, § 12.102; *see Izer v. State*, 77 Md. 110, 115, 26 A. 282, 283 (1893).

All of the official acts of a *de facto* officer, filling a *de jure* office, done in regard to public matters affecting the public interest, are, upon grounds of public policy and necessity, considered as valid and binding as if they had been performed by *de jure* officers. *Kone, supra*, at 231 Md. 473, 190 A. 2d 803; *Reed, supra*, at 226 Md. 246, 172 A. 2d 543; *Havre de Grace v. Fahey*, 108 Md. 533, 538-39, 70 A. 218, 220 (1908); *Koontz v. Burgess*, 64 Md. 134, 136, 20 A. 1039 (1885); *see Hetrich v. County Commissioners of Anne Arundel County*, 222 Md. 304, 312, 159 A. 2d 642, 646 (1960). A mere usurper does not acquire the status of a *de facto* officer and his acts generally are void unless and until he continues to act for so long a time as to afford a presumption of his right to act. *Reed, supra*, at 226 Md. 244, 172 A. 2d 542-43; *Van Amringe v. Taylor*, 12 S. E. 1001, 1007 (N.C. 1891); 2A *Antieau, Municipal Corporation Law*, § 22.01 (1974); 63 Am.Jur.2d *Public Officers and Employees*, § 499 (1972).

Where there is a *de jure* office, all that is required to make an officer *de facto* is that the individual claiming the office

be in possession of it, performing its duties, and claiming to be such officer under color of right. Since color of right may consist of holding over after the expiration of a term, one who is actually in possession of a public office, by virtue of holding over after the expiration of a previous official term, and who discharges the duties of such office, is at least a *de facto* officer. *Reed, supra,* at 226 Md. 243-46, 172 A. 2d 542-43; *Benson v. Mellor,* 152 Md. 481, 487-92, 137 A. 294, 296-98 (1927); 3 *McQuillin, supra,* § 12.102.

It has long been recognized in this State, as elsewhere, that the public interest requires, in the absence of any provisions to the contrary, that public offices should be filled at all times, without interruption. *Reed, supra,* at 226 Md. 242-43, 172 A. 2d 542; *Benson, supra,* at 152 Md. 491, 137 A. 298. In accord with this principle the Court of Appeals has recognized that an elected or appointed officer may remain in office at the expiration of his term and is entitled to exercise the powers of the office until his successor qualifies, whether or not the statute creating the office so provides. *Reed, supra,* at 226 Md. 242, 172 A. 2d 541; *Walker v. Talbot County,* 208 Md. 72, 79-80, 116 A. 2d 393, 397 (1955); *Benson, supra,* at 152 Md. 491, 137 A. 296-97; *Ijams v. Duvall,* 85 Md. 252, 261-62, 36 A. 819, 820 (1897); *Ash v. McVey,* 85 Md. 119, 130, 36 A. 440, 442 (1897); *Lynn v. Mayor and City of Cumberland,* 77 Md. 449, 454, 26 A. 1001, 1002-03 (1893); *Robb v. Carter,* 65 Md. 321, 335, 4 A. 282, 284 (1886); *Sappington v. Scott,* 14 Md. 40, 54-55 (1859); *Thomas v. Owens,* 4 Md. 189, 221-22 (1853). Under a statute which specifically provides that officers shall continue to hold office until their successors lawfully qualify, incumbents who so continue and have qualified are *de jure* officers. Under a statute which does not specifically so provide, incumbents who hold over are *de facto* rather than *de jure* officers. *Claude v. Wayson,* 118 Md. 477, 487-90, 84 A. 562, 565-66 (1912); *Smoot v. Somerville,* 59 Md. 84, 88-89 (1882).

Here it is evident that Board members Wilson and Moore were acting as *de facto* officers when they adopted the resolution amending the zoning map. Initially each one was properly appointed to the office to fill the unexpired term of

a resigned Board member, and each of them apparently took the requisite oath. Neither they nor any other person thereafter sought election or was elected to the office of member of the Board. Thus, until the next elections, one to be held in 1974 and one to be held in 1976, no successor could qualify. From the time of their initial appointment until the time of the enactment of the map amendment, both Wilson and Moore were in possession of the office of a member of the Board and were performing the duties of that office openly, notoriously, and in full view of the public. Both of them were former incumbents, validly appointed and properly qualified, whose claim to office was based upon a right to hold over until the qualification of a successor, even though the applicable provisions of the Allegany County Code did not specifically so provide.

Since the powers of *de facto* officers extend to the issuance of a zoning ordinance and a properly amended zoning map, and since the public acts of a *de facto* officer are valid and binding, the enactment of the resolution amending the zoning map was valid and binding, and, if not arbitrary and capricious, should be accorded full force and effect.[4] *See Walker, supra,* at 208 Md. 79, 116 A. 2d 397.

---

4. The protestants' reliance upon Ridout v. State, 30 S.W.2d 255, 258 (Tenn. 1930), is misplaced. That case held that a "holdover" judge was a *de facto* officer whose acts were valid and binding. Language in Ridout to the effect that an exception to the rule that a *de facto* officer's acts are valid and binding exists "where the attack was direct on the person acting or affected" is dicta, which at best, is inapplicable where, as here, third parties affected by the public acts of *de facto* officers are collaterally questioning the validity of these acts. *See* State v. Hart, 185 P. 769 (Montana 1919); Van Amringe, *supra.*

Also misplaced is the protestants' reliance upon Apice v. American Woolen Company, 60 A. 2d 865, 870 (R.I. 1948), in which the decision of a workmen's compensation hearing officer was challenged on direct appeal. Because there was then no lawfully created position of hearing examiner, the decision of the person who assumed such an office was held to be void. This holding accords with the general principle, recognized in Maryland, that there can be no *de facto* officer where there is no corresponding *de jure* office. *See* Kone, *supra,* at 231 Md. 471, 190 A. 2d 803; Reed, *supra,* at 226 Md. 246, 172 A. 2d 543; Izer, *supra,* at 77 Md. 115, 26 A. 283; 3 *McQuillin, supra,* § 12.104. Here, where there is no question that the positions of members of the LaVale Zoning Board were lawfully created, the result reached in Apice is inapposite.

## III

We now reach the basic issue in this case which is whether the map amendment adopted by the 1973 resolution constituted a comprehensive rezoning and if so, whether it bore a substantial relationship to the public health, welfare, order, safety, convenience, morals and general welfare. For a resolution of this question additional facts must be considered.

Most of the 84 acre tract designated as Section J, comprising the focal point of this case, was the subject property of a previous individual map amendment application which requested reclassification from the Rural-Residential and Residential A zones to the Commercial A zone. After a hearing at which a group of residents in the surrounding area appeared to protest, the LaVale Zoning Board changed the property's classification to Commercial A, thereby making possible the proposed construction of an enclosed shopping mall of approximately 500,000 square feet, accommodating over fifty stores. The Board premised its decision on a finding that there had been a substantial change in the character of the neighborhood since the original zoning in 1958. The protestants appealed to the Circuit Court for Allegany County which concluded that the rezoning was unjustified because no legally sufficient evidence to establish a change in the character of the neighborhood had been adduced before the Board. The court reversed the Board's decision. In *Border v. Grooms*, 267 Md. 100, 297 A. 2d 81 (1972), the Court of Appeals affirmed the trial court.

The protestants contend that the action of the Board in rezoning the entire LaVale District was arbitrary and capricious. They maintain that the comprehensive rezoning was a subterfuge employed for the sole purpose of accomplishing a rezoning of the 84 acre tract of land located in Section J, which is the same site formerly proposed for a shopping center in *Border*, *supra*. They assert that the Board, in initiating the proposed extensive revision of the LaVale zoning map, was attempting to achieve indirectly through the device of comprehensive rezoning that which

they failed to achieve directly by way of the individual map amendment case. In support of their position they point out that the changes proposed by the reclassification of Sections A through I were inconsequential and essentially unopposed, whereas the change proposed by the reclassification of Section J was "extensive," "revolutionary," and vigorously opposed. They conclude that the action of the Board in incorporating a residentially zoned tract, which it had previously but unsuccessfully attempted to reclassify to Commercial A, into a subsequently adopted comprehensive zoning map as a Commercial A zone, being arbitrary and capricious, should be deemed null and void.

We are persuaded that the 26 November 1973 resolution of the LaVale Zoning Board granting, among other things, the requested reclassification of Section J, was comprehensive in nature and, in conjunction with the zoning regulations of the LaVale Zoning District, established a comprehensive zoning plan for the LaVale Zoning District. The indicia of "comprehensiveness" in a zoning plan are well established. A comprehensive zoning plan is one which applies to or covers a substantial or wide geographical area. It must be well thought out and based upon considerations concerning the common needs of the particular area. In other words, it must be the product of careful consideration and extensive study. It must be designed to control and direct the use of land and buildings according to present and planned future conditions, so as to accomplish, as far as possible, the most appropriate uses of land consistent with public interests and the safeguarding of the interests of the individual property owners. Other characteristics of comprehensiveness may be found in the fact that it zones all, or substantially all, of a political subdivision, that it regulates all uses — good, bad and indifferent, or that it covers all of the usual factors of land utilization: height, area and use. *Nottingham Village, Inc. v. Baltimore County,* 266 Md. 339, 354-55, 292 A. 2d 680, 688 (1972); *Trustees of McDonogh Educational Fund and Institute v. Baltimore County,* 221 Md. 550, 561, 158 A. 2d 637, 642 (1960). The fact that few changes in zoning are made does not affect the comprehensive nature of the plan. *Scull v. Coleman,* 251 Md. 6, 10-11, 246 A. 2d 223, 225 (1968).

Here, all of the criteria of comprehensiveness are present. The area to be rezoned was the entire LaVale Zoning District comprised of a total of some 13,700 acres. Approximately 1,328 acres, or nearly ten per cent of the land within the district, was reclassified, approximately 925 acres being reclassified from Rural-Residential to Residential A, and approximately 414 acres being reclassified from Rural-Residential to Commercial A. The amount of land reclassified to the Commercial A zone doubled the previously existing commercially zoned land within the community. Of the 414 acres reclassified to the Commercial A zone only 84 are here the subject of complaint.

For a period of eight to ten months before the plan's proposal and submission to the public, the Board gave it careful consideration and extensive study. After due notice, two public hearings were held at which much testimony was adduced. The Board reviewed the nature and extent of the then existing land classifications and uses. The availability and adequacy of public facilities such as water, sewers and roads, were taken into account. The present and future needs of the citizens of the LaVale Zoning District and of Allegany County were explored thoroughly.

The new map reflects extensive changes occurring over a wide area and takes into account future public needs and purposes. As we have indicated, it was given careful consideration and adopted only after extensive study. The plan was designed to provide an adequate potential for orderly growth in the future and to satisfy local and regional needs. It zones all or substantially all of the political subdivision and regulates all uses, good, bad and indifferent. It is, therefore, in every respect, a comprehensive zoning plan. *Montgomery County Council v. District Land Corp.*, 274 Md. 691, 693-702, 337 A. 2d 337, 712, 714-18; *Scull, supra*, at 251 Md. 10-11, 246 A. 2d 225; *McBee v. Baltimore County*, 221 Md. 312, 316-17, 157 A. 2d 258, 260 (1960).

Further, we find that the Board's resolution of 26 November 1973 was not a "subterfuge" designed for the sole purpose of achieving that which it could not achieve through an individual map amendment. When the property

comprising Section J was originally reclassified to the Commercial A zone by the grant of an individual map amendment on 14 February 1972, the comprehensive plan for the entire LaVale Zoning District had not yet been developed. That initial proceeding was limited to the consideration of whether there had been, in the past, a change in the character of the neighborhood sufficient to justify the reclassification. It did not concern the question here involved of what might be appropriate for the future growth and development of the LaVale Zoning District and Allegany County. The Court of Appeals has recognized that, if there has not been a change or mistake legally sufficient to warrant a piecemeal reclassification, "regional comprehensive rezoning is the only method available to provide for the needs of a nascent residential community." *Hardesty v. Dunphy*, 259 Md. 718, 726, 271 A. 2d, 152, 156 (1970). The comprehensive rezoning enacted by the adoption of the 26 November 1973 resolution was an appropriate vehicle for the Board to employ in order to achieve its purpose of providing a potential for orderly future growth.

Recently, in a case involving a comprehensive rezoning, the Court of Appeals stated that the motives or wisdom of a legislative body in passing an ordinance are not subject to judicial inquiry. A court may appropriately consider matters of public record which directly relate to the arbitrary, capricious, or discriminatory quality of the conduct of the zoning authority. *District Land Corp., supra*, at 274 Md. 705-06, 337 A. 2d 712, 720-21. There is nothing in the record here to support an inference of arbitrariness or capriciousness on the part of the Board.

The case of *George F. Becker Co. v. Jerns*, 230 Md. 541, 187 A. 2d 841 (1963), relied on by the protestants, is inapposite. There, the Board of County Commissioners of Howard County in June, 1959, despite the contrary recommendations of its planning commission, reclassified to the M-2 (heavy industrial) zone a 19 acre piece of land. This land was bounded by residentially zoned and developed land around the whole of its perimeter except for a distance of about 900 feet which lay along the right-of-way of the Baltimore and

Ohio Railroad. The property lying on the other side of the railroad tracks was classified and developed in the M-2 zone. Indeed, immediately opposite the subject property was a cement products plant and a garage.

Opponents of the reclassification filed a bill in equity attacking the validity of the action of the Board on the theory that it was arbitrary and created invalid spot zoning. In July, 1960, while the appeal was still pending, the planning commission submitted a new general plan to the Board for adoption. The proposed map recommended, as it had done in 1958, that the original residential classification of the property in question be retained. After a number of hearings at which no change was contemplated, the Board, in adopting the new plan as the official zoning map of the county, specified, without stating reasons, that the new plan and map should be revised so as to show that the property in question had been rezoned for industrial use. The record showed that the Board, having made up its mind as to what was proper zoning for the property two years before, never abandoned the opinion then expressed. It based its decision to revise the comprehensive rezoning map solely on conditions that had existed "back in 1959," without considering any further evidence, because, as the president of the Board testified, such conditions had not "changed at all." The opponents, who were surprised when they subsequently learned that a change in the proposed zoning map had been ordered, sought and were granted leave to amend their bill of complaint, then pending, so as to also attack rezoning on the theory that the alleged unorthodox action of the Board was invalid.

The Court of Appeals found that the action of the Board in classifying the property in question as industrial was invalid spot zoning, not in accordance with the comprehensive plan. The court further pointed out that the subsequent action of the Board in adopting the comprehensive rezoning map, in which the classification of the subject property was changed from the originally designated residential zoning to industrial, was in fact no more than a reaffirmation, under the guise of comprehensive rezoning, of a challenged

reclassification that had not been heard and disposed of by the courts. The court there stated, at 230 Md. 546, 187 A. 2d 844, that:

> "Since the comprehensive rezoning of 1961 was subsequently admitted by the Board to have been based solely on the reclassification of 1959, it is clear that the validity of the change in zoning should be viewed, not in the light of subsequent events, but in the light of conditions when the reclassification was made."

The court, under the peculiar circumstances there present, treated the reclassification as nothing more than an individual map amendment, found that there was no showing of mistake in the original zoning or substantial change in the character of the neighborhood, and held the action of the Board, with respect to that 19 acre industrially zoned tract, to be invalid.

Here, the validity of the requested reclassification for Section J had been finally disposed of by the Court of Appeals on 29 November 1972, *Border, supra,* prior to the time at which the comprehensive rezoning was prepared and submitted for public hearing after public notice given initially on 22 June 1973. The reclassification of Section J was a part of the comprehensive rezoning map as originally proposed. Thus, prior to and during the two public hearings, the question of the appropriateness of that classification was debated, discussed and considered. Much evidence concerning the appropriateness of that classification was adduced before the Board. Consequently, there cannot be an allegation here that the reclassification of Section J constituted invalid spot zoning, irreconcilable with the comprehensive plan. Indeed, under the present circumstances it is clear that the comprehensive rezoning of 26 November 1973 was not concerned with the reclassification of 1972, which dealt essentially with whether there had been, in the past, a change sufficient to justify reclassification, but rather was based on the overall considerations involved in planning for future growth.

Accordingly, the validity of the change in the zoning of Section J must be viewed in the light of the events surrounding the adoption of the comprehensive rezoning and as a part of that process.

Having determined that the 26 November 1973 resolution constituted comprehensive rezoning, we turn next to the remaining question of whether that rezoning bore a substantial relationship to the public health, comfort, order, safety, convenience, morals and general welfare. The applicable test for determining the scope of judicial review in a case alleging that a comprehensive rezoning is arbitrary and capricious because it bears no relation to the general welfare has been stated in *Ark Readi-Mix Concrete Corp. v. Smith*, 251 Md. 1, 4, 246 A. 2d 220, 221-22 (1968):

> "Zoning is a legislative function, and when reviewing the acts of the zoning authorities, the duty of the courts is to decide whether such action was arbitrary, discriminatory or illegal. A court cannot substitute its judgment for that of the zoning authorities if their decision is supported by substantial evidence and the issue before them is fairly debatable. When a comprehensive map designed to cover a substantial area is adopted, it is entitled to the same presumption of correctness as an original zoning. Thus, persons attacking the correctness of the map's classification have a heavy burden of overcoming the presumption of its validity." (Citations omitted.)

*See District Land Corp., supra,* at 274 Md. 702, 337 A. 2d 718: *Scull, supra,* at 251 Md. 9-10, 246 A. 2d 224-25. *See also Rockville Fuel v. Gaithersburg Board of Appeals,* 257 Md. 183, 187, 262 A. 2d 499, 502 (1970). We find that the protestants have failed to meet that test.

While the protestants assert that the establishment of a shopping center "would possibly be a detriment to the public health, public safety, public morals and general welfare," as it will greatly increase the traffic in the area, and will "certainly pollute the air by the addition of 7,000 more

vehicles in the area on a daily basis," their only specific contention that the Board's action was arbitrary, capricious, unreasonable and illegal, consists of a general and abstract statement that the Board refused to consider the mandates contained in certain federal regulations concerning environmental protection and a report concerning air pollution in Allegany County. There is nothing in the record to indicate that the Board failed to consider these federal regulations, even assuming that they were applicable or were in effect at the time of the rezoning, or that the Board did not consider the air pollution report. Moreover, a failure by the Board to take this evidence into account, had it occurred, would not in and of itself establish that the comprehensive zoning plan adopted by the Board bore no relationship to the general public welfare.

The record is replete with conflicting evidence on the question of the impact of the comprehensive rezoning, in general, and the reclassification of Section J, in particular, on the region, the community, the immediate neighborhood, and the adjoining and confronting property owners. The protestants have failed to meet the heavy burden that was theirs. The record is simply devoid of any evidence on which to predicate a conclusion that the comprehensive rezoning here bore no substantial relationship to the general public welfare.

The question of the impact of the comprehensive rezoning on the general public welfare is fairly debatable. The trial court was correct in affirming the action of the Board. Accordingly, its order will be affirmed.

*Order affirmed.*
*Costs to be paid by appellants.*